In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1752

CHRISTOPHER PYLES,

*Plaintiff-Appellant*,

*v.*

MAGID FAHIM, Doctor, Medical Director, Menard CC, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:11-cv-000378-SCW — **Stephen C. Williams**, *Magistrate Judge*.

SUBMITTED AUGUST 28, 2014 — DECIDED NOVEMBER 13, 2014

Before WOOD, *Chief Judge*, and EASTERBROOK and RIPPLE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Christopher Pyles, an Illinois prisoner, injured his back when he slipped on wet stairs at Menard Correctional Center. Mr. Pyles sometimes used those stairs when showering, and a month before his fall he had alerted the warden, Donald Gaetz, that this stairway can be treacherous because of the water tracked from the nearby showers.

Mr. Pyles contends, in this action under 42 U.S.C. § 1983, that Warden Gaetz was deliberately indifferent to the hazard, and that Wexford Health Sources ("Wexford"), which provides contract medical care to Menard inmates, and a Wexford physician, Magid Fahim, were deliberately indifferent to his back injury. Mr. Pyles alleged that, after initially being treated for his fall, he suffered ongoing, significant pain, yet Dr. Fahim refused to investigate its cause.

At screening, *see* 28 U.S.C. § 1915A, the district court dismissed Mr. Pyles's claim against the warden. A magistrate judge (presiding by consent) later granted summary judgment for Wexford and Dr. Fahim on the medical claim. On appeal, Mr. Pyles challenges the adverse rulings on both of his Eighth Amendment claims.

Although we do not fully agree with the district court's analysis, we conclude that the court correctly reasoned that the slipping hazard about which Mr. Pyles complained was not sufficiently dangerous to support an Eighth Amendment claim. We also agree with the district court that, from the evidence submitted at summary judgment, a finder of fact could not reasonably conclude that Mr. Pyles's medical claim rests on more than a disagreement with Dr. Fahim about the appropriate course of treatment. We therefore affirm the judgment of the district court.

# I

## Background

### A.

In late June 2009, Mr. Pyles addressed and sent to Warden Gaetz an emergency grievance in which he complained that the stairs that he and others in the cell block use to access the "six gallery" showers become dangerously slick from water tracked by the inmates' shower shoes.[1] This footwear was required, but the inmates had no means of drying the soles before accessing the stairs, and the stairs themselves lacked measures to reduce the slipping hazard caused by accumulated water. In his grievance, Mr. Pyles recounted his own difficulties with safely traversing the stairs and requested that additional precautions be taken to address the issue.[2] As far as the record shows, no one replied to Mr. Pyles's grievance.

Then, on July 25, 2009, roughly five weeks after he submitted his emergency grievance, Mr. Pyles fell on the wet stairs while returning from the "six gallery" showers.[3] He struck his head on a step and then injured his lower back as he

---

[1]  R.13 at 3, 8.

[2]  Twice in recent weeks, Mr. Pyles recounted, he had slipped on these wet stairs but avoided falling. He sometimes could not "make it to" the showers on his own floor, he explained, and he urged that "some preventative measures" be taken to reduce the "risk of injury or physical harm" presented by these stairs. *Id* at 8.

[3]  *Id.* at 11; R.117-2 at 5.

tumbled down the stairs. He lost consciousness and was temporarily paralyzed from the waist down. He first was taken to a local hospital. CT scans did not reveal spinal damage, but a radiologist recommended an MRI "[i]f there remains a clinical concern for injury."[4] An MRI, the radiologist explained, "is more sensitive in evaluating the soft tissues."[5] Before the day ended, Mr. Pyles was airlifted from the local hospital to a hospital in St. Louis, Missouri. During his stay at that facility, doctors obtained MRI views of Mr. Pyles's head, neck, and spine. His treating physicians also ordered additional CT scans. The attending radiologists reported that none of these diagnostic procedures showed abnormal results.[6] The doctors in St. Louis diagnosed Mr. Pyles with a spinal contusion. Mr. Pyles was seen by both a physical therapist and an occupational therapist in St. Louis. After observing Mr. Pyles's unsteady gait and lingering mobility problems, each prescribed some therapy to improve Mr. Pyles's functional mobility.

Mr. Pyles returned to Menard after five days in St. Louis. He remained in the prison infirmary for another four days, where he was seen daily by staff. Afterward, he was released to the general population, but continued to complain about extreme pain in his lower back. Doctors examined him six times in the next two months. Each time, the treating physician concluded that only a painkiller, usually nonprescription

---

[4] R.117-2 at 3.

[5] *Id.*

[6] Doctors did worry that one of the MRI views showed hemorrhaging in the spinal canal, but a spinal angiogram revealed no bleeding.

ibuprofen, was warranted.[7] Two back X-rays revealed "[p]ost [t]raumatic [a]rthritic changes" in Mr. Pyles's spine, but no fracture or other abnormality.[8]

In late September 2009, two months after Mr. Pyles's injury, Dr. Fahim joined Wexford as the medical director at Menard. When Dr. Fahim first examined Mr. Pyles in January 2010, he wrote in the medical file that he had not detected any abnormality. He substituted, nevertheless, a muscle relaxer and a prescription painkiller for the nonprescription ibuprofen that Mr. Pyles previously had been receiving. Dr. Fahim also instructed Mr. Pyles on the "proper exercise [and] stretching of [b]ack mus[c]les" that could alleviate his back pain.[9] Mr. Pyles informed the Doctor that his back pain had been worsening and requested another MRI, but Dr. Fahim said he did not see the need.

Dr. Fahim examined Mr. Pyles twice more, in May and October 2010. Both times he wrote in the medical notes that Mr. Pyles reported low back pain but that the examination revealed no problems. During the May visit, however, Dr. Fahim increased the dosages of Mr. Pyles's medications, and then in October he prescribed a corticosteroid, an

---

[7] One doctor prescribed a prescription painkiller, but the medical director who preceded Dr. Fahim discontinued it after one week. Mr. Pyles testified at his deposition that he never received anything other than nonprescription ibuprofen during that two-month period.

[8] R.117-3 at 8.

[9] *Id.* at 9.

anticonvulsant, and a drug commonly used in treating osteoarthritis.

During the period that Dr. Fahim was treating him, Mr. Pyles also was being seen by other medical personnel at Menard. None reported a need for additional medical care. A new X-ray was taken in May of that year, but it showed only "minimal" or "mild" degenerative changes to Mr. Pyles's spine.[10]

Dr. Fahim did not examine Mr. Pyles again after October 2010, and in August 2011 he left Wexford's employ. During this period Mr. Pyles continued seeing other physicians and medical staff nearly once per month. On one occasion Dr. Fahim did review Mr. Pyles's medical file after another physician forwarded a request from Mr. Pyles for an MRI. Dr. Fahim again refused to order the test, explaining that no physician at Menard had recommended an MRI after examining Mr. Pyles.

Near the time of Dr. Fahim's resignation, however, Mr. Pyles's family physician provided a letter stating that, if she were treating Mr. Pyles, she would have ordered an MRI and "referred him to a specialist if needed."[11] It is unclear from this correspondence, however, whether Mr. Pyles's personal physician knew that he had been hospitalized after his fall. Nevertheless, notes written in Mr. Pyles's file by doctors who

---

[10]  *Id.* at 33.

[11]  R.129-4 at 17.

succeeded Dr. Fahim as medical director endorse Dr. Fahim's view that another MRI was unnecessary.

Mr. Pyles maintained, in grievances to prison officials and in his declaration to the district court, that Dr. Fahim had refused to record the true nature and substance of his complaints. Mr. Pyles maintained that he has suffered constant, excruciating pain in his lower back, radiating into his legs; this pain, he said, was more intense when he was sitting or reclining and caused numbness when he stood. He did not experience pain in his neck or thoracic region, but the pain in his lower back had grown increasingly worse since his return from the St. Louis hospital. He did not contest, however, that Dr. Fahim had changed the medication that he prescribed to treat the back pain or that Dr. Fahim and other medical staff regularly had instructed him about stretching exercises that could help alleviate his back pain. Mr. Pyles also acknowledged that physical activity partly relieved his pain.

Mr. Pyles further testified at his deposition that Dr. Fahim had once said that a new treatment (a cortisone shot) might be attempted and that a visit to a specialist might be warranted. These plans were scrapped, however, after Mr. Pyles visited with another doctor. Mr. Pyles contended that an appointment with the specialist never was scheduled for the same reason that he never received an additional MRI: Wexford has a policy of limiting the medical care it provides in order to cut costs, and the company effectuates this policy by rewarding employees who successfully control costs.

Mr. Pyles bases this belief on conversations that he had with unnamed medical staff at the jail, who told him that a

visit to a specialist or an MRI would not happen "because it costs too much money."[12] Because of this alleged policy, Mr. Pyles seeks to hold Wexford responsible for what he characterizes as deliberate indifference to his back pain.

Dr. Fahim, for his part, maintains that he never received incentives to cut costs by providing less expensive treatment, and an affidavit submitted by a Wexford manager further attests that the company does not offer rewards or bonuses to physicians who minimize costs by withholding necessary medical care.

## B.

Mr. Pyles brought this action in May 2011, nearly two years after his injury and before Dr. Fahim's departure. In addition to claiming that Warden Gaetz had been deliberately indifferent to the risk of injury from the slippery stairs, Mr. Pyles alleged that Dr. Fahim and Wexford deliberately had ignored his back pain. Mr. Pyles alleges that, instead of addressing the underlying cause of his pain, Dr. Fahim merely continued to prescribe ineffective drugs, while ignoring Mr. Pyles's complaints of continuous and worsening back pain. The need for "a change in treatment," Mr. Pyles alleged, "would have been obvious" to a layman, and the failure to change course renders the treatment constitutionally

---

[12] R.13 at 23.

deficient.[13] Mr. Pyles demanded damages as well as injunctive relief, in particular that he be scheduled for another MRI and a consultation with a specialist.

In dismissing, at screening, the claim against Warden Gaetz, the district court reasoned that Mr. Pyles had "not pled sufficient facts to state a claim that Defendant  Gaetz was deliberately indifferent" to the conditions "that made a particular flight of stairs unsafe."[14] Mr. Pyles's claim is groundless, the court continued, because "the same wet staircase would also be used by guards and other officials," and a failure to maintain dry stairs "cannot be considered cruel and unusual."[15]

The parties then consented to proceed before a magistrate judge sitting as the district court. *See* 28 U.S.C. § 636(c). In granting summary judgment for Wexford and Dr. Fahim, the district court concluded that Mr. Pyles lacks evidence of deliberate indifference during the time that Dr. Fahim was treating Mr. Pyles.[16] The court reasoned that undisputed

---

[13]  R.13 at 4. Mr. Pyles also brought a state-law negligence claim against Warden Gaetz and a medical malpractice claim against Dr. Fahim, but he has abandoned these supplemental claims on appeal, and we do not mention them further.

[14]  R.14 at 6.

[15]  *Id.*

[16]  The court limited its analysis to this period because Mr. Pyles filed a separate lawsuit against the physicians at Menard who have treated his back since Dr. Fahim's departure. *See Pyles v. Nwaobasi, et al.*, No. 13-cv-0770

(continued...)

evidence establishes that Dr. Fahim was attentive to Mr. Pyles's complaints, actively looked for back problems on the occasions he examined Mr. Pyles, and continually changed his prescribed course of medication in order to relieve Mr. Pyles's pain. And the court concluded that Mr. Pyles's quarrel with Dr. Fahim about scheduling an MRI was a disagreement about the proper exercise of medical discretion, not a constitutional violation. Wexford, the court continued, could not be held liable because no company policy was the "moving force" behind any constitutional violation.[17]

## II

## Discussion

### A.

We review both the decision to dismiss a prisoner's complaint at screening and a grant of summary judgment de novo. *See Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1068 (7th Cir. 2012); *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1039 (7th Cir. 2012) (per curiam).

---

[16] (...continued)
(S.D. Ill. filed July 30, 2013). In that action, the defendants filed a motion for summary judgment for failure to exhaust administrative remedies, which the district court granted on September 30, 2014, thereby dismissing the action, *see Pyles v. Nwaobasi, et al.*, No. 13-cv-0770, slip op. at 14 (S.D. Ill. Sept. 30, 2014).

[17] R.136 at 12 (quoting *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010)).

The Eighth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, protects prisoners from prison conditions that cause "the wanton and unnecessary infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), including both hazardous prison conditions, *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994), and grossly inadequate medical care, *see Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one. *See Whitley v. Albers*, 475 U.S. 312, 325 (1986).

In order to state a claim under the Eighth Amendment for deliberate indifference to a hazardous condition of confinement, Mr. Pyles needed only to allege that Warden Gaetz deliberately ignored a prison condition that presented an objectively, sufficiently serious risk of harm. *See Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008).[18] Although Mr. Pyles was required to allege that Warden Gaetz acted with a sufficiently culpable state of mind, he could meet this burden by asserting that the warden knew about the hazardous condition and "turned a blind eye to it." *Vance v. Peters*, 97 F.3d 987, 994 (7th Cir. 1996).

Similarly, to prevail on his medical claim, Mr. Pyles was required to make two showings. First, he needed to demonstrate that he suffers from an objectively serious medical

---

[18] *See also Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001).

condition. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).[19]
A medical condition is objectively serious if a physician has
diagnosed it as requiring treatment, or the need for treatment
would be obvious to a layperson. *Knight v. Wiseman*, 590 F.3d
458, 463 (7th Cir. 2009).[20] Second, Mr. Pyles had to demonstrate
that Dr. Fahim knew about his condition and the risk it posed,
but disregarded that risk. *Arnett*, 658 F.3d at 751.[21] Something
more than negligence or even malpractice is required.
*Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

A prisoner may establish deliberate indifference by
demonstrating that the treatment he received was "blatantly
inappropriate." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)
(quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).
Making that showing is not easy: "A medical professional is
entitled to deference in treatment decisions unless 'no
minimally competent professional would have so responded
under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894–95
(7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d
982, 988 (7th Cir. 1998)). Disagreement between a prisoner and
his doctor, or even between two medical professionals, about
the proper course of treatment generally is insufficient, by
itself, to establish an Eighth Amendment violation. *Johnson v.*

---

[19]  *See also Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009).

[20]  *See also Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007).

[21]  *See also Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

*Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).[22] The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *Sain*, 512 F.3d at 895.

Finally, with regard to Mr. Pyles's claim against Wexford, because § 1983 does not permit liability to rest on the doctrine of *respondeat superior*, *Maniscalco v. Simon*, 712 F.3d 1139, 1145–46 (7th Cir. 2013), Mr. Pyles was required to show that a Wexford policy was the "direct cause" of or "moving force" behind his constitutional injury. *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010).[23]

**B.**

With those standards in mind, we turn first to Mr. Pyles's conditions-of-confinement claim against Warden Gaetz. Mr. Pyles's complaint alleges that Warden Gaetz consciously ignored a safety hazard after being told about that hazard. The accident and the severity of Mr. Pyles's injuries raise an inference that the stairway used to access the "six gallery" showers was unsafe for that purpose. Before he was injured,

---

[22]  *See also Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

[23]  Although Wexford is a private corporation, we analyze claims against the company as we would a claim of municipal liability. *Minix*, 597 F.3d at 834; *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 n.1 (7th Cir. 2004).

Mr. Pyles had addressed and sent his "emergency grievance" directly to Warden Gaetz, *see* Ill. Admin. Code tit. 20, § 504.840. Yet according to Mr. Pyles, his grievance was not acknowledged in the following weeks before his fall, and neither was any change made to lessen the hazard presented by the wet stairs. These allegations make out, at this stage of the proceedings, a plausible claim that Warden Gaetz knowingly turned a blind eye to the hazard which led to Mr. Pyles's injury.

The district court's analysis of the complaint gives us pause. Instead of asking whether Mr. Pyles's complaint states a plausible claim of deliberate indifference, the district court required that Mr. Pyles plead facts and, even before discovery, "show that Defendant Gaetz acted with a sufficiently culpable state of mind."[24] But proof comes later, not at the complaint stage. *See Smith*, 666 F.3d at 1039; *Bennett v. Schmidt*, 153 F.3d 516, 518–19 (7th Cir. 1998).

The district court also concluded that Mr. Pyles's claims failed because the staircase is not a condition "unique to confinement" because that same staircase would be used by guards and other prison employees. Yet that is too restrictive a view of the Eighth Amendment. Prison life cannot so easily be equated to life on the outside. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his

---

[24] R.14 at 6.

safety and general well-being."); *Estelle*, 429 U.S. at 103–04. The simple fact that persons other than prisoners made use of this stairwell, however, does not automatically render Mr. Pyles's claim meritless.

Nevertheless, we agree with the central point of the district court's analysis: The hazard about which Mr. Pyles complains is not sufficiently serious to invoke the Eighth Amendment. Federal courts consistently have adopted the view that slippery surfaces and shower floors in prisons, without more, cannot constitute a hazardous condition of confinement.[25] Accordingly, despite incorrectly holding Mr. Pyles's complaint to a heightened pleading standard, the district court correctly dismissed this claim at screening.

## C.

We turn next to Mr. Pyles's claims against Dr. Fahim and Wexford. Mr. Pyles contends that the district court erred in

---

[25] *See Coleman v. Sweetin*, 745 F.3d 756, 764 (5th Cir. 2014) (per curiam) (agreeing with district court that, as a matter of law, "prisoner slip-and-fall claims almost never serve as the predicate for constitutional violations," thus upholding *sua sponte* dismissal of deliberate-indifference claim brought by inmate who slipped and fell in shower); *Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004) (upholding dismissal at summary judgment of Eighth Amendment claim brought by inmate who attributed slip-and-fall to standing water in shower, since "slippery floors constitute a daily risk faced by members of the public at large"); *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993) (reasoning that, even if shackled inmate might fall on wet floor while showering, allegations of "slippery prison floors" do not state "even an arguable claim for cruel and unusual punishment"(quoting *Jackson v. Arizona*, 885 F.2d 639, 641 (9th Cir. 1989)).

granting summary judgment for Dr. Fahim and Wexford because Dr. Fahim had persisted in a course of treatment known to be ineffective and refused to schedule an MRI or refer him to a specialist in order to avoid diagnosing the real injury to Mr. Pyles's back.

The parties do not quarrel over whether Mr. Pyles suffers from a serious medical condition, so we will assume, for the purpose of our analysis, that Mr. Pyles's back pain is an objectively serious medical condition. *See Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008). The dispute instead concerns whether Dr. Fahim's refusal to schedule Mr. Pyles for an MRI or to authorize a visit to a specialist permits an inference that he possessed the mental culpability required to hold him liable under the Eighth Amendment.

An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is "a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107.[26] Mr. Pyles did not submit evidence from which a jury reasonably could find that Dr. Fahim's exercise of medical judgment departed significantly from accepted professional norms. *See Roe*, 631 F.3d at 857–58; *Jackson*, 541 F.3d at 697–98. Rather, Dr. Fahim's decision to forego an MRI was implicitly endorsed by every other doctor who examined Mr. Pyles.

---

[26] *See also Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013) (per curiam); *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995).

Mr. Pyles's assertion regarding Dr. Fahim's decision to forego a specialist's opinion presents a somewhat closer question. A prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care. Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006), and so refusal to refer supports a claim of deliberate indifference only if that choice is "blatantly inappropriate," *see Roe*, 631 F.3d at 858.

On occasion, we have noted that failure to authorize such a visit permits an inference of deliberate indifference. For instance, in *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010), we concluded that summary judgment in favor of a jail physician was unwarranted because the physician, in response to complaints of severe unremitting and unexplained tooth pain, had "rejected the obvious alternative of referring [the prisoner] to a dentist." *Id.* at 441. In *Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008), a prison physician's refusal to authorize a visit to a urologist to treat a prisoner's painful scrotal cysts and spasms, in the face of increasing pain and after a previous physician had spoken to a urologist about the prisoner's condition, was sufficient to create a triable issue of fact. *Id.* at 524–26. In *Greeno v. Daley*, we likewise concluded that summary judgment for prison medical staff was inappropriate. 414 F.3d at 655. The prisoner there suffered from severe intestinal distress over a period of years, and was ultimately diagnosed by a specialist as having an esophageal ulcer. *Id.* at 648–51. We concluded that the prison doctor's refusal to send the inmate to a specialist would allow a jury to find for the prisoner because the

possibility of an ulcer had been noted in the prisoner's medical file two years before the diagnosis, and the prisoner had been made to suffer in the meantime. *Id.* at 655. Similarly, in *Jones v. Simek*, 193 F.3d 485 (7th Cir. 1999), a prison physician was not entitled to summary judgment because the evidence supported an inference that the physician had recognized that an inmate suffered from a "nerve problem" but then for six months refused to authorize a consultation with a neurologist. *Id.* at 491.

Animating our rulings in these cases is the principle that if the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the "obdurate refusal" to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition. *See Greeno*, 414 F.3d at 654. We conclude that this principle does not foreclose summary judgment in favor of Dr. Fahim. Here, unlike the situations in *Greeno* and *Jones*, there was no prior indication of a potentially serious long-term medical issue, nor was the need for a specialist obvious, such as in *Berry* or *Hayes*. Rather, there is nothing in this record that suggests that Dr. Fahim's choice was "blatantly inappropriate." *Roe*, 631 F.3d at 858.

Mr. Pyles suffers from back pain, a common ailment. On this record a jury could not conclude that Dr. Fahim inflicted cruel and unusual punishment on Mr. Pyles by refusing to refer him to a specialist. We do *not* mean to suggest that back pain never requires treatment by a specialist, but only that it is not warranted under these circumstances.

We agree with the district court that the undisputed evidence establishes that Dr. Fahim was not deliberately indifferent to Mr. Pyles's pain. When Mr. Pyles complained that his medications were not helping, Dr. Fahim responded by prescribing new medications or changing the dosages. Mr. Pyles may have wanted different treatment, but his disagreement with Dr. Fahim does not allow him to prevail on his Eighth Amendment claim. As far as this record shows, Dr. Fahim's choice of treatment was not blatantly inappropriate.

Finally, Wexford cannot be held liable for damages because there is no underlying constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). Moreover, even if a violation did occur, Mr. Pyles's only evidence of a Wexford policy is an unsubstantiated, hearsay assertion, which is insufficient to defeat summary judgment. *See, e.g.*, *Boyce v. Moore*, 314 F.3d 884, 889–90 (7th Cir. 2002).

## Conclusion

For the foregoing reasons, we uphold both the decision to dismiss Mr. Pyles's conditions-of-confinement claim at screening and the grant of summary judgment on Mr. Pyles's medical claims. The defendants' actions did not create the kind of extreme deprivations that merit relief under the Eighth Amendment. The judgment of the district court is affirmed.

AFFIRMED