> **NONPRECEDENTIAL DISPOSITION**
> To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted October 23, 2015[*]
Decided October 28, 2015

**Before**

MICHAEL S. KANNE, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 14-3801

| | |
|---|---|
| HARRY POWELL, <br> *Plaintiff-Appellant*, | Appeal from the United States District Court for the Central District of Illinois. |
| *v.* | No. 12 C 3261 |
| VIPIN SHAH, *et al.*, <br> *Defendants-Appellees*. | Sue E. Myerscough, <br> *Judge*. |

**O R D E R**

Harry Powell, an Illinois inmate, appeals the grant of summary judgment against him in this suit under 42 U.S.C. § 1983, asserting that Wexford Health Services, which contracts with the prison to provide medical care, and two Wexford doctors were deliberately indifferent in not referring him to a specialist and ordering physical therapy.

---

[*] After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(a)(2)(C).

The district court concluded that the defendants had not been deliberately indifferent. We affirm.

Powell began receiving treatment after injuring his left knee during a basketball game at the Western Illinois Correctional Center. He saw a nurse two days later, complaining of knee pain and difficulty walking and straightening his leg. The nurse gave him a cold compress and Tylenol. Two days after that, Powell saw Dr. Vipin Shah, who recorded no swelling in the knee but noted Powell's difficulty bending his leg. Dr. Shah prescribed ibuprofen and a warm pack for what he described as Powell's "soft tissue injury to the left knee." After Powell received an x-ray two days later, Dr. Shah concluded that the injury was likely caused by an "osteochondral lesion-osteochondral dessicans" or possibly a bone fracture.[1] He prescribed ibuprofen, crutches, an Ace bandage, and a knee brace for six months; and he recommended that Powell be assigned to a first-floor cell and a low bunk.

Dissatisfied with the treatment, Powell filed successive grievances about his knee pain. About two months later, Powell's counselor followed up on one of the grievances with a written response: "According to HCV–Dr. Shah, patient has been seen multiple times, treated with plan suggested by utilization management, knee brace, rest, [and] immobilization. If this does not help, he will be referred to ortho."

Over the next eight months and 21 appointments, Dr. Shah treated Powell for varying levels of knee pain. At one of the earlier appointments, a second x-ray showed results similar to the first, and Dr. Shah continued to treat Powell with pain medication and a knee brace. Later, after receiving an MRI, Powell says that he was told by the technician that he would need arthroscopic surgery. Dr. Shah, however, concluded from the MRI that Powell's ligaments were intact and his knee was stable; he therefore continued prescribing the same course of treatment, though varying the doses and

---

[1] An "osteochondral lesion-osteochondral dessicans" is alternately described as a "tear or fracture in the cartilage covering one of the bones in a joint," *Cedars-Sinai Medical Center*, Osteochondral Lesions/Osteochondritis Dessicans (Oct. 23, 2015), https://www.cedars-sinai.edu/Patients/Health-Conditions/Osteochondral-Lesions-Osteochondritis-Dessicans.aspx, or "a joint condition in which bone underneath the cartilage of a joint dies due to lack of blood flow," *Mayo Clinic*, Osteochondritis Dissecans (Oct. 23, 2015), http://www.mayoclinic.org/diseases-conditions/osteochondritis-dissecans/basics/definition/con-20024803.

strength of the pain medication. Six months into his treatment, Powell asserts, Dr. Shah told him that he "has done all he is going to do for [Powell]." Later that month, Dr. Shah recommended exercise for Powell's recent weight gain. And about two months after that, Dr. Shah advised "relaxation behavior" for his knee pain.

Four months after his last appointment with Dr. Shah, Powell saw another prison doctor, Dr. Thomas Baker, for an ibuprofen refill and because his knee sleeve had loosened. Dr. Baker reviewed Powell's records, ordered blood work to monitor any effects from Powell's prolonged use of ibuprofen, and then essentially continued the same treatment plan prescribed by Dr. Shah. Powell saw Dr. Baker for three more appointments until he was transferred to another prison the following year.

After his transfer, Powell sued Dr. Shah and Dr. Baker, arguing that they treated his knee injury deficiently and caused him prolonged pain, suffering, and emotional distress. He asserted that the doctors should have referred him to an orthopedic surgeon and ordered physical therapy. He also sued Wexford, asserting that its policy of restricting referrals to outside specialists to save money was unconstitutional.

The case proceeded to discovery, and Powell filed a motion to recruit counsel, which the court denied, finding that he was competent to litigate his claims. Ten months later Powell filed a second motion to recruit counsel, which the court also denied. The parties then filed cross-motions for summary judgment, after which Powell sought the appointment of an expert medical witness to explain why orthopedic surgery was necessary. The court denied Powell's request, finding that he had failed to establish the need for an expert and, further, he essentially was seeking, not a neutral expert, but an expert to testify on his behalf.

The district court then granted summary judgment in favor of defendants. The court found that none of the evidence cited by Powell created a fact question regarding whether the doctors' treatment decisions rose to the level of deliberate indifference. First, with regard to the counselor's response to his grievance that Powell would be "referred to ortho," the court discounted the response as irrelevant because Powell had not shown that the counselor had medical training or knowledge or even authority to recommend that Powell see an orthopedic specialist. Second, with regard to Powell's statement that the MRI technician told him that he would need surgery, the court rejected that evidence as inadmissible hearsay and, in any event, it would not be sufficient to defeat summary judgment because it referred merely to a difference of medical opinion. And third,

regarding Powell's "subjective belief" that he should be referred to a specialist, the court found that this "supposition" did not constitute evidence that the doctors' treatment was blatantly inappropriate. Finally, the court concluded that Powell failed to produce any evidence that Wexford maintained an unconstitutional policy that caused him to suffer a constitutional deprivation.

Powell then filed a postjudgment motion to reconsider, asserting that he could prove the inadequacy of his treatment through newly discovered evidence: the opinion of an orthopedic surgeon—whom he saw after re-injuring his knee at another prison—that he should have had surgery when he first injured his knee. The district court construed Powell's motion to reconsider as brought under Rule 59(e) and denied it, finding that the evidence concerned a new, later knee injury and was not related to the treatment at issue for his knee injury two years earlier.

On appeal Powell challenges the grant of summary judgment and specifically the court's discounting of evidence that he submitted. He argues that the district court erroneously attributed the statement that he would be "referred to ortho" to his counselor rather than Dr. Shah, and that this statement—in addition to his other evidence—shows that the doctors knew that they should have referred him to a specialist yet refused to do so.

The district court did not err in concluding that Powell failed to create a fact question over whether the doctors were deliberately indifferent. Although continuing an ineffective treatment plan may constitute deliberate indifference, *Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir. 2011); *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010), the treatment decision must be "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Even if the statement that Powell would be "referred to ortho" came from Dr. Shah rather than his counselor, the district court nevertheless correctly concluded that Powell's evidence did not support his contention that his doctors abandoned their professional judgment when they regularly monitored him but did not refer him to a specialist or order physical therapy. Powell cannot point to any evidence that calls into question Dr. Shah's exercise of professional judgment—in concluding from two x-rays, an MRI, and multiple check-ups that Powell's knee was stable and could be treated with a knee brace, varying doses and strengths of pain

medication, and exercise—or Dr. Baker's, in continuing Dr. Shah's regimen and prescribing the same treatment after examining Powell's medical records and ensuring through blood testing that he was not suffering any adverse effects from the medication. This record supports the district court's conclusion that Powell's evidence amounted to a mere disagreement with his doctors' treatment decisions and was therefore insufficient to establish deliberate indifference. *See Pyles*, 771 F.3d at 409.

Powell also argues that summary judgment in favor of Wexford was error because Dr. Shah stated that he would have to consult Wexford before referring him to an orthopedic surgeon since "money can be an issue, cause [sic] there is not money," and Wexford has a "public record of unconstitutional policies." But as the district court correctly determined, not only is the evidence speculative, but Wexford cannot be held liable for damages if, as here, Powell cannot show an underlying constitutional violation. *See Pyles*, 771 F.3d at 412; *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013).

Next, Powell challenges the district court's denial of an expert medical witness, arguing that the need for an orthopedic specialist who could explain the standard of care was apparent from the court's misguided ruling. An expert was not necessary, however, given the straightforward facts of the case and Powell's failure to produce evidence that the treatment was not appropriate. *Gaviria v. Reynolds*, 476 F.3d 940, 945 (D.C. Cir. 2007). Moreover, the only issue in this case was whether the doctors had a "sufficiently culpable state of mind," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Holloway*, 700 F.3d at 1072, which the court accurately recognized as a subjective inquiry that did not require an expert, *see Ledford v. Sullivan*, 105 F.3d 354, 359–60 (7th Cir. 1997).

Finally, Powell argues that the district court abused its discretion by denying him counsel because the case involved conflicting medical testimony and he is incarcerated, indigent, and lacks legal training. But as the district court correctly pointed out, Powell demonstrated over the course of litigation that he was competent to litigate his case. Powell filed "cogent pleadings" and defeated an earlier motion for summary judgment on exhaustion grounds; his claims and knee injury were not novel or complex; and he had personal knowledge of the facts underlying his claims and was able to obtain his own medical records. *See Olson v. Morgan*, 750 F.3d 708, 711–12 (7th Cir. 2014); *Pruitt v. Mote*, 503 F.3d 647, 654–55 (7th Cir. 2007) (en banc).

AFFIRMED.