**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted February 11, 2016[*]
Decided March 18, 2016

**Before**

DIANE P. WOOD, *Chief Judge*

RICHARD A. POSNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 15-1653

| | |
|---|---|
| ROBERT MADDEN, <br>     *Plaintiff-Appellant,* | Appeal from the United States District Court for the Eastern District of Wisconsin. |
|     *v.* | No. 13-C-549 |
| ENRIQUE LUY, and <br> DAVID FOLEY, <br>     *Defendants-Appellees.* | Rudolph T. Randa, <br> *Judge.* |

**O R D E R**

Robert Madden, a Wisconsin inmate, appeals the grant of summary judgment against him in this suit under 42 U.S.C. § 1983, asserting that two doctors (one at the prison where he was incarcerated, and one at a hospital to which he was referred) were deliberately indifferent to his serious medical needs when they failed appropriately to

---

[*] After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and record. See FED. R. APP. P. 34(a)(2)(C).

treat complications and pain he experienced following a surgical procedure. The district court concluded that no jury could rule in Madden's favor. We affirm.

Madden, who had a history of chronic hepatitis C, was an inmate during the time in question at the Racine Correctional Institution. After a scan revealed a small tumor in his liver, Madden was referred to the Primary Liver Tumor Clinic at the University of Wisconsin (UW) Hospital.

Two weeks later he was examined by Dr. David Foley, a liver and kidney transplant surgeon employed by the UW Hospital, who confirmed the presence of a 1.4 centimeter tumor. Dr. Foley acknowledged that Madden was a suitable candidate for resection, but believed (for reasons on which he did not elaborate) that a "microwave ablation" was Madden's best treatment option. Microwave ablation is a technique that involves sticking a microwave-emitting probe directly into the tumor for the purpose of destroying it.

Less than a week later, the microwave ablation was performed by two radiologists at the hospital. Medical records reflect that there were complications in the form of a small area of "diaphragmatic burn and intercostal musculature burn"—in other words, burns to some of the tissue surrounding the liver. Madden says he was never informed of these burns, though he was admitted for inpatient care under Dr. Foley, the surgeon on duty. While hospitalized, Madden ran fevers as high as 102 and experienced pain, and Dr. Foley treated him with oral medication. Six days later Dr. Foley discharged Madden. This was his final interaction with Madden.

Madden returned to Racine and came under the care of Dr. Enrique Luy, the prison's staff physician. Dr. Luy prescribed methadone for pain caused by the burns and otherwise monitored Madden's liver condition. An MRI taken roughly 18 months after the first ablation revealed a possible second tumor, and so Dr. Luy referred Madden back to the UW Hospital's Liver Tumor Clinic.

At that clinic Madden was examined by Dr. Alexandru Musat, a transplant hepatologist, who noted his complaints of continuing pain at the site of the previous ablation. Dr. Musat wrote to Dr. Luy that Madden's case should be evaluated by the Hospital's Multidisciplinary Tumor Board to determine whether he should be treated again with a "local regional therapy" (such as another ablation) or evaluated for a liver transplant. Dr. Musat also recommended that Dr. Luy refer Madden to the UW Hospital's Pain Clinic to determine whether a nerve block would better manage

Madden's pain if a repeat ablation were *not* going to be performed "at this time." The Board recommended that Madden be referred for a transplant evaluation and that the lesion be monitored and possibly treated with a second ablation.

Dr. Luy referred Madden for the transplant evaluation but declined to send him to the pain clinic because the Board had not ruled out a second ablation. Instead Dr. Luy maintained Madden's methadone prescription.

Over the next year, Dr. Luy continued to collaborate with Dr. Musat to monitor Madden's second tumor and coordinate his care. After one exam Dr. Musat found that the tumor had increased in size to 2.3 cm and opined that it needed to be removed. He also noted that Madden had suffered a "significant" muscle injury from the earlier ablation and recommended that Madden's methadone dosage be increased. Madden underwent a procedure to remove the second tumor shortly thereafter. Throughout the following year, Dr. Luy adjusted Madden's methadone dosage three times based on recommendations from Dr. Musat (Dr. Luy noted on one of the authorizations that Madden had twice been caught selling methadone to other inmates, but that he "could not discontinue methadone liquid because this was recommended by Dr. Musat for pain"). Madden remained on methadone for 18 months after the second tumor was removed. He told Dr. Luy that he wished to discontinue taking the drug, at which point Dr. Luy referred him to the UW Hospital's Pain Clinic, which found that there was "no good interventional or surgical solution" for his pain. Madden was transferred to another facility shortly thereafter and had no further contact with Dr. Luy.

Madden brought this deliberate-indifference suit against Dr. Foley and Dr. Luy. He asserted that Dr. Foley injured him during the ablation and then prolonged his pain and suffering by failing to tell him about the complications from the procedure. Madden further charged that Dr. Luy displayed deliberate indifference to his pain by keeping him on addictive medication rather than referring him to the pain clinic when Dr. Musat first recommended the referral.

As the litigation unfolded, Madden repeatedly— and unsuccessfully—filed motions for recruitment of counsel and for assistance in obtaining discovery. Six times he moved to recruit counsel, and each time the court denied his motion, finding that he was competent to litigate his claims, that the quality of his filings was high, and that the issues were not unduly complex. In addition, Madden moved three times to compel the defendants to produce his medical records. The court similarly denied each of these motions, noting that Madden could obtain his records directly from the UW Hospital

and the Department of Corrections, and that he actually had copies of the relevant records, which he received when the defendants attached them to their motion for summary judgment.

The district court granted summary judgment for the two doctors, concluding that Madden failed to identify any facts that pointed in the direction of deliberate indifference toward his medical needs. Not only was it undisputed that Dr. Foley did not perform the ablation but, even if he had, there was no issue of non-disclosure because Madden's burns had been noted in his medical records and thus were made known to subsequent treating providers. Further, the court determined, Foley's course of treatment—Tylenol and ibuprofen to treat Madden's fevers and prescription medications for pain—was "not so far afield" as to allow an inference of deliberate indifference. Nor had Dr. Luy been deliberately indifferent to Madden's pain: Madden had premised his claim on Dr. Luy's failure to refer him to the pain clinic, but Dr. Musat had recommended such a referral *only* if the Board concluded that a second procedure not be performed, and the Board had not, in fact, ruled out a second procedure. And it was not "blatantly inappropriate" for Dr. Luy to continue Madden's methadone prescription "in collaboration with Dr. Musat."

On appeal Madden generally challenges the grant of summary judgment against him, essentially reiterating the arguments he raised in the district court. But as the district court properly concluded, Madden failed to create a fact question on the question whether Dr. Foley treated him with deliberate indifference. To survive summary judgment, Madden needed to present evidence that Dr. Foley knew of and disregarded an excessive risk to his health or safety—in other words, that the doctor exhibited a reckless disregard of harm. *King v. Kramer*, 680 F.3d 1013, 1018–19 (7th Cir. 2012); *Estate of Cole v. Fromm*, 94 F.3d 254, 258–59 (7th Cir. 1996). Although a failure to treat serious, chronic pain may constitute deliberate indifference, *Walker v. Benjamin*, 293 F.3d 1030, 1039–40 (7th Cir. 2002); *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997), disagreement about a proper course of treatment does not suffice. The treatment received must be "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). The medical records confirm that Dr. Foley did not perform the ablation. And even if Dr. Foley somehow were at fault for not disclosing to Madden the nature of the complications from the ablation, Dr. Foley nevertheless treated his pain and noted the burns in his medical records, ensuring that the details of the burns would be available to subsequent treatment providers. The fact that Madden was given a powerful narcotic painkiller by Dr. Luy after he returned to Racine undermines Madden's suggestion that the seriousness of his injuries was unknown.

Madden also maintains that Dr. Luy was deliberately indifferent by ignoring until this case began Dr. Musat's recommendation that he be referred to a pain clinic. But here too we agree with the district court that Madden has failed to raise a triable issue regarding deliberate indifference on the doctor's part. Madden misunderstands Dr. Luy's reason for not following Dr. Musat's recommendation. Dr. Luy declined to make a referral because Dr. Musat premised his recommendation on a second procedure *not* being performed. But even if Dr. Luy favored a method of pain treatment other than the one recommended by Dr. Musat, this would not amount to "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment," *Pyles*, 771 F.3d at 409. Madden *did* receive treatment for his pain in the form of increasing doses of a powerful narcotic. (The fact that Madden was twice caught selling his methadone to other inmates also undercuts his assertion that his pain was not being effectively managed.) The lack of any evidence that he was harmed by Dr. Luy's delay in referring him dooms his claim of deliberate indifference.

Madden also asserts that the district court erred by denying his motions to compel discovery of his medical records. But as the court explained in denying the motions, the defendants in their court filings provided him with addresses that he could use to obtain his own medical records. And in any event, Madden obtained the records he sought when the defendants attached them to their motion for summary judgment. He therefore suffered no prejudice by the court's denial of his motions. See *James v. Hyatt Regency Chicago*, 707 F.3d 775, 784 (7th Cir. 2013).

Madden also contends that the district court abused its discretion by denying his motions to recruit counsel. But the district court committed no abuse of discretion when it denied his requests, because his claims were not novel or complex and he had proven competent to litigate the case. His arguments were straightforward and did not require interpretation of complex medical evidence, and he repeatedly demonstrated his ability to handle the litigation. Moreover, Madden has not shown a *reasonable likelihood* that representation would have changed the outcome of the case. *Henderson v. Ghosh*, 755 F.3d 559, 564–65 (7th Cir. 2014); *Johnson*, 433 F.3d at 1007.

AFFIRMED.