NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604

Submitted December 21, 2017[*]
Decided December 21, 2017

**Before**

DIANE P. WOOD, *Chief Judge*

JOEL M. FLAUM, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 16-3664

| | |
|---|---|
| HECTOR R. DeJESUS, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Central District of Illinois. |
| *v.* | No. 1:14-cv-01260 |
| SALVADOR A. GODINEZ, et al., *Defendants-Appellees*. | Sara L. Darrow, *Judge*. |

**O R D E R**

Hector DeJesus, an Illinois prisoner at Hill Correctional Center, brought this lawsuit under 42 U.S.C. § 1983 after he was beaten by his cellmate. He asserted that Hill's cell-placement policy and its failure to provide adequate nutrition caused the attack and demonstrated the prison officials' deliberate indifference to a serious risk of harm. He further claimed that Wexford Health Sources, Inc. and its staff, who provide medical services at Hill, had a cost-cutting policy that caused them to be deliberately

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. *See* FED. R. APP. P. 34(a)(2)(C).

indifferent to his injuries. Ultimately, Judge Darrow entered summary judgment for the defendants, and DeJesus appeals. We affirm the judgment.

We recite the facts in the light most favorable to DeJesus, the non-movant. *Proctor v. Sood*, 863 F.3d 563, 564 (7th Cir. 2017). Beginning in May 2012, prison officials started a pilot program to serve two meals per day—brunch and dinner—instead of three. The menu was adjusted so that each inmate received the same number of calories, eight ounces of protein (up from six), and at least five fruit or vegetable options a day (a new requirement). The IDOC's dietician attested that two meals a day instead of three was adequate nutrition for an otherwise healthy person. But DeJesus testified that in practice, starting in 2009, portion sizes were continually reduced, and several items on the menus never made it to the prisoners or were inedible. At times the meal trays were nearly empty, and DeJesus once heard the kitchen manager admonishing the staff to give out "little bits." As a result, DeJesus says, many inmates who could not afford commissary items were starving. This included his cellmate, who attacked him for his commissary money.

As for cell placements, at IDOC intake, all inmates are initially screened to determine whether they can have a cellmate. Then, upon arriving at Hill, each inmate is interviewed by staff to learn more specific information about him. Afterwards, the Placement Office assigns cells, which requires an official to assess whether two inmates will get along. They consider, among other things, each inmate's age, size, gang affiliation, release date, and history of violence as well as possible racial tension. An inmate can raise housing concerns at any time but is moved only if an investigation reveals a problem.

DeJesus is Puerto Rican, and in July 2012, was 61 years old and not gang-affiliated. His cellmate at the time, Jamie Evans, was African American, 20 years younger, bigger in size and physically stronger than DeJesus, and not recorded as gang-affiliated. They had not been flagged as incompatible. On July 8, while DeJesus was sitting on the toilet, Evans unexpectedly attacked, punching, kicking, and choking him. The beating ended only when DeJesus agreed to give Evans his commissary money. A passing guard took DeJesus to the prison's medical clinic.

At the clinic, DeJesus first showered on his own, and then was examined by two nurses, defendants Sarah Faetanini and Lorna Stokes. The nurses recorded that he suffered a "superficial laceration" on his forehead and abrasions on his body. The injury report states that DeJesus had no trouble talking, sitting, or walking, nor did he have

shortness of breath or bruising. DeJesus says he was in worse shape—he could barely talk or breathe and had bruises all over his body. The nurses did not refer him to see the doctor; instead they cleaned his wounds and gave him ibuprofen before he was taken to investigative segregation. A week later, Stokes and a different nurse saw DeJesus at sick call because he was complaining of back pain. They did not report any swelling, bruising, or difficulty with walking, standing, or sitting. Once again they gave him pain medication and did not refer him to a doctor. DeJesus testified that Stokes accused him of "bullshitting" the nurses about having broken bones, explaining he just had sore muscles that needed exercise instead.

On July 25, after reviewing the earlier treatment notes, Dr. Kul Sood examined DeJesus, finding no tenderness or bruising on his back and normal range of motion and vitals. DeJesus asked Dr. Sood to take x-rays, but Dr. Sood refused, saying x-rays caused cancer. Instead, Dr. Sood prescribed Naprosyn, an anti-inflammatory, for DeJesus's pain and ordered a follow-up appointment for August 1. On that day too, his exam was unremarkable, although DeJesus still complained of a little tenderness in his back. Dr. Sood extended his Naprosyn prescription by five days.

After that, DeJesus's complaints related to the assault became sporadic. In late August he complained that his back and rib cage had been hurting since the attack. He had no visible signs of discomfort, but a nurse gave him ibuprofen for the pain. This repeated in May and August 2013; medical staff observed no objective signs of discomfort but gave him pain medication anyway. In March 2014, a nurse gave him ibuprofen and ordered x-rays of his thoracic and lumbar spine and his chest. The x-ray results revealed that DeJesus had a pectus excavatum deformity in his thoracic wall, which is a congenital defect, and that his spine had spurring and slight scoliosis, which an outside radiologist said were both degenerative changes. DeJesus, on the other hand, believes that the attack injured his back, causing his continuing pain.

Two weeks before Evans attacked, DeJesus had sent a transfer request to defendant Shawn Gibbs, one of the correctional officers who assigned cellmates; DeJesus said that Evans was "too loud" and "aggressive from day one." He received no response. Gibbs attested that he never got any letter from DeJesus about any "problem with his cell." DeJesus admits that Evans had never threatened him and that he had no reason to believe that Evans would physically attack him.

DeJesus filed suit in June 2014. In his amended complaint, DeJesus alleges that the prison had a policy of intentionally celling vulnerable inmates with "dangerous

predators" while also reducing the food served to starve the "predators" into being violent. According to DeJesus, these policies led directly to Evans's attack in July 2012 in order to take his commissary money. DeJesus further alleges that Wexford had a policy of providing inadequate treatment to save money. This policy, he alleges, caused the medical staff to ignore his requests for an x-ray and instead just give him medicine, which was ineffective.

During discovery DeJesus filed several motions to compel, asking Judge Darrow to order the defendants to turn over, among other things, records of all violent activity at the prison (or at least data summarizing this activity) and two of his cellmates' (including Evans's) rap sheets. The defendants objected on many grounds, including that these requests were overly burdensome because they spanned years and the defendants had only monthly reports; they covered information in confidential files; and their disclosure would create "safety and security" risks. The judge agreed with the defendants that they could not produce nonexistent information (such as the summaries DeJesus wanted) and that some of the documents would involve security risks, so she denied DeJesus's motion.

Throughout the litigation, DeJesus was keen on getting testimony from a medical expert. He moved for the recruitment of counsel in part because he thought counsel could obtain an expert witness to review his x-rays. (The court never specifically addressed that issue in denying the motion but concluded generally that DeJesus could competently litigate his claims.) He also separately requested twice that the court appoint an independent expert to examine the x-rays. Although the medical staff believed that the x-rays showed degenerative changes and a congenital defect, he thought that the abnormalities were caused by his cellmate's assault. Judge Darrow denied his first request on the grounds that DeJesus did not need an expert and that DeJesus appeared to want his own, partial expert witness, not the independent expert Rule 706 contemplates. The judge denied the second motion as moot upon entering summary judgment for the defendants.

Judge Darrow granted the motions for summary judgment of the state (IDOC) defendants and the medical (Wexford) defendants on all claims. The judge understood DeJesus's claims to be that (1) the Wexford defendants were deliberately indifferent to the serious injuries his cellmate inflicted; (2) the prison's brunch system was an unconstitutional condition of confinement; and (3) Hill's alleged cell-placement policy was unconstitutional. She also posited that DeJesus intended to raise a failure-to-protect theory of relief. After granting judgment for certain individual defendants for lack of

personal involvement and Wexford for DeJesus's failure to establish that there was a policy in play (the only way to hold Wexford liable), the judge concluded that DeJesus had not offered enough evidence to raise a genuine issue of material fact about any remaining defendant's culpability.

On appeal, DeJesus first argues that the district judge wrongly construed his contentions about inadequate food as a freestanding claim. Instead, he says, he challenged that policy only as part of his claim that prison officials created a substantial risk of harm to older, weaker inmates by placing them in cells with starving "predators." We take DeJesus at his word and do not consider whether the brunch system provided inadequate nutrition in violation of the Eighth Amendment.

As for DeJesus's interrelated contentions that two of Hill's supposed policies— intentionally pairing stronger cellmates with weaker ones and starving them to spark conflict—violate the Eighth Amendment, they are unfounded. He says that Hill staff celled him with "large, younger predators" who were part of gangs and used "food rations which stimulated them into robbing and threatening" him. The IDOC defendants' motivation in having these policies, he contends, is to use the "predators" as "a form of [ ] discipline," making inmates "co-operate" with prison staff, and to increase commissary profits, which "pay for the fat pay checks of the commissary and kitchen staff" and help "feed the [IDOC] staff lavish meals in separate kitchens." And DeJesus thinks that they targeted him specifically, using dangerous cellmates to punish him because he left a job in the kitchen to attend school instead. Once their plan worked, they then "conspired with the medical staff" "to conceal evidence" of his injuries.

At the summary-judgment stage, DeJesus had an evidentiary burden to meet, and he fell short. The IDOC defendants set forth evidence showing that prison policy was to house compatible inmates together, and that the policy required them to consider many different factors, including size differences and gang affiliation. Affidavits from the correctional officers who assigned cells stated that they followed this policy in DeJesus's case. DeJesus has no contrary evidence; he simply infers from his experiences, and those of a few other inmates, that at Hill there was an official policy of housing older, weaker inmates with younger, stronger, gang-affiliated ones. But his suspicions, even when expressed under oath, are not evidence that creates a genuine issue of material fact. *See Aguilar v. Gaston-Camara*, 861 F.3d 626, 630–31 (7th Cir. 2017).

The same is true of DeJesus's claim that prison officials had a policy of starving inmates to cause them to prey on weaker cellmates so that the officials both had job security and gained commissary profits to fund their paychecks and staff kitchen. DeJesus could testify about what he personally experienced, but his belief that his experiences stemmed from official prison policy, again, are pure speculation. *See Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017); *McGee v. Adams*, 721 F.3d 474, 483–84 (7th Cir. 2013). Not only that, his theories simply do not make sense.

Aside from the claims about Hill's unlawful policies, DeJesus also, at times, seems to argue that defendant Gibbs (who was responsible for cell placement) or others knew about, yet failed to protect him from, "a substantial risk of serious harm" from Evans. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994). For example, he emphasizes that he had reported that Evans was "aggressive" before he was attacked. Gibbs, for his part, denies ever receiving DeJesus's request to be moved. Assuming that DeJesus's version is true, however, his transfer request referring to Evans as "aggressive" falls short of being a report of "a specific, credible, and imminent risk of serious harm" that would sufficiently put Gibbs on notice, especially since DeJesus admits that even he had no idea Evans would attack. *See Gevas v. McLaughlin*, 798 F.3d 475, 481 (7th Cir. 2015).

Regarding the Wexford defendants, DeJesus maintains that they were not entitled to summary judgment on his claim that they ignored or undertreated his injuries from the attack. He points to certain parts of his testimony that the judge did not recount, such as his own description of his injuries, Stokes's comment that he was lying about having broken bones, and Dr. Sood's statement that x-rays cause cancer. Assuming first that his condition was objectively serious (which the defendants contest), none of these statements, alone or in combination, would allow a reasonable jury to conclude that the medical staff's behavior fell so outside the applicable standard of care that they were not basing treatment on their medical judgment. *See Proctor*, 863 F.3d at 568; *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). The record reflects "active treatment" by the medical staff, including multiple examinations, dispensing of medication, and eventually, a diagnostic x-ray. *See Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017). This kind of "meaningful and ongoing assessment of a patient's condition is the antithesis of 'deliberate indifference.'" *McGee*, 721 F.3d at 482.

Plainly, DeJesus disagrees with Dr. Sood's decision not to order x-rays shortly after the attack, but his dissatisfaction with that choice does not, without more, establish that Dr. Sood was deliberately indifferent. *See Pyles*, 771 F.3d at 409; *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Moreover, "the question whether an X-ray or

additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). And although DeJesus believes that the attack caused his back problems, he is not competent to deliver this opinion and has no medical evidence to support it.

To that end, DeJesus argues that the district judge abused her discretion in denying his motions for a court-appointed expert who would examine the x-rays of his back and spine. *See* FED. R. EVID. 706(a). But Rule 706 is used to appoint a neutral expert to interpret complex information for the trier of fact, not to represent the interests of one party, as DeJesus appears to think. *See Kennedy v. Huibregtse*, 831 F.3d 441, 443 (7th Cir. 2016). The district judge reasonably concluded here that an expert would not have been helpful. *See* FED. R. EVID. 702; *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004). And even if an appointed expert had disagreed about what the x-ray showed with respect to the cause of DeJesus's pain, disagreement among doctors, without evidence that one is not exercising medical judgment, is not evidence of deliberate indifference. *See Pyles*, 771 F.3d at 409.

Finally, we will not disturb the district court's discovery rulings. DeJesus contends that records of other violent incidents at the prison and his cellmates' rap sheets were not confidential and would help establish that the prison polices caused pervasive violence. But a record of prison violence would say nothing of its cause, so having the data would not assist DeJesus in proving that the supposed policies existed. Further, the judge accepted the defendants' objection that giving DeJesus information about other inmates would cause privacy concerns and security risks. This was not an abuse of her considerable discretion over discovery matters. *See Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115–16 (7th Cir. 2013).

We have reviewed DeJesus's remaining contentions, including those regarding Wexford's purported cost-cutting policy and individual defendants' personal involvement, and none has merit. Accordingly, we AFFIRM the judgment.