



FILED

Jan 25 2024, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Indiana Supreme Court

Supreme Court Case No. 23S-CT-99

## Edward Zaragoza,
*Appellant (Plaintiff below)*

—v—

## Wexford of Indiana, LLC, et al.,
*Appellees (Defendants below)*

Argued: June 22, 2023 | Decided: January 25, 2024

Appeal from the Marion Superior Court,
No. 49D03-1906-CT-22347
The Honorable Gary L. Miller, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 22A-CT-206

**Opinion by Justice Goff**

Chief Justice Rush and Justices Massa, Slaughter, and Molter concur.

**Goff, J.**

An inmate must rely entirely on prison authorities to see that his or her medical needs are met. If they aren't, the route to relief runs through the courts, which must not prematurely close their doors to a potentially meritorious claim. The inmate here suffers from hypothyroidism. Prison doctors prescribed him medication, but he complained of side effects. This led him to make persistent requests for alternative medication over several years. Eventually, he filed this suit against three doctors and their employer, seeking damages and injunctive relief on claims of medical malpractice and deliberate indifference to serious medical need. The trial court awarded summary judgment to the defendants even though the inmate presented the affidavit of a physician deploring the defendants' treatment decisions. Today, we clarify what makes a medical expert's affidavit both admissible and substantively sufficient to create an issue of fact in a malpractice case. And, applying our well-established summary-judgment standard, we find conflicts in the evidence that require us to reverse the trial court.

## Facts and Procedural History

The plaintiff, Edward Zaragoza, is incarcerated at Wabash Valley Correctional Facility. The defendants, Samuel J. Byrd, M.D., Naveen Rajoli, M.D., and Jackie L. West-Denning, M.D., are licensed physicians who were employed by Wexford of Indiana, LLC, a firm contracted for medical services at DOC facilities. Each of the doctors provided medical care to Zaragoza at the prison.

In 2012, Zaragoza was diagnosed with hypothyroidism. He was initially prescribed the medication Synthroid, which is generally recommended, but the dosage was reduced after he complained of side effects. In 2015, Zaragoza first experienced what might have been symptoms attributable to his condition. Beyond these background facts, however, the opposing parties dispute almost every point concerning Zaragoza's condition and treatment.

According to the defendants, Zaragoza has "subclinical" hypothyroidism. Appellees' Br. at 8. All three defendant doctors prescribed Synthroid, which they say Zaragoza refused to take as ordered. In their opinion, Zaragoza did not suffer severe adverse effects or allergic reactions clearly attributable to the medication, as opposed to symptoms of his under-medicated condition. And all give the opinion, as medical experts, that they provided appropriate treatment "within the community standard of care for general practitioners." App. Vol. II, pp. 112, 120, 125.

Zaragoza's evidence paints a different picture. Dr. Richard Schultheis reviewed Zaragoza's records and states that he has a "serious medical condition" that usually requires lifetime treatment. *Id.* at 200. He disputes the "subclinical" label. *Id.* at 208–09. He explains that Zaragoza also has multiple allergies and that he reported "severe adverse effects" from taking Synthroid, including "severe headaches, neck pains, blurry vision and hip pains." *Id.* at 201. In Dr. Schultheis's expert opinion, the "severity and longevity" of Zaragoza's "rare adverse effects" meant that the standard of care was to discontinue Synthroid and try an alternative medication designed for patients who are allergic to its inactive ingredients. *Id.* at 202. He particularly faults Dr. Byrd for persisting in "his ineffective and harmful treatment," Dr. West-Denning for advising Zaragoza to take seven days' worth of Synthroid at once "despite knowing the dangers," and Dr. Rajoli for making "little or no effort" to treat him. *Id.* at 202, 206, 207.

By the time he was deposed in this case in 2019, Zaragoza had not taken hypothyroidism medication since mid-2018. He stated then that his hormone levels were "very good," although he continued to experience "some symptoms." App. Vol. III, pp. 178–79. We understand that Zaragoza is currently being treated with a non-allergenic alternative medication.

Acting pro se, Zaragoza filed this suit against the defendants, raising state-law medical-malpractice claims, claims of deliberate indifference to his medical needs in violation of the Eighth Amendment, and other claims not at issue in this appeal. The defendants do not assert that he had to submit a proposed complaint to a medical review panel, as the doctors are

not qualified providers for purposes of the Medical Malpractice Act.[1] They did, however, seek summary judgment, arguing that "the undisputed evidence" showed they provided "appropriate care and treatment." App. Vol. II, p. 72. The trial court awarded summary judgment to the defendants. Zaragoza's motion to correct error was subsequently deemed denied when the court failed to rule on it. *See* Ind. Trial Rule 53.3(A). The Court of Appeals affirmed the judgment in a memorandum decision. *Zaragoza v. Wexford of Indiana, LLC*, 194 N.E.3d 621 (Ind. Ct. App. 2022). We granted transfer, vacating the Court of Appeals decision. *See* Ind. Appellate Rule 58(A).

## Standards of Review

Cases "hinging on disputed material facts" are "'a matter for trial, not summary judgment.'" *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1188 (Ind. 2016) (quoting *Hughley v. State*, 15 N.E.3d 1000, 1005–06 (Ind. 2014)). Thus, a party seeking summary judgment must show that "undisputed evidence affirmatively negates a required element" of the non-movant's claim or defense. *Community Health Network, Inc. v. McKenzie*, 185 N.E.3d 368, 377 (Ind. 2022) (citing *Siner*, 51 N.E.3d at 1187–88). The "initial burden" is on the movant to demonstrate the absence of an issue for trial. *Hughley*, 15 N.E.3d at 1003. If satisfied, the burden then shifts to the non-movant to "come forward with contrary evidence showing an issue for the trier of fact." *Id.* (internal quotation marks and citation omitted).

Our review is de novo. *Id.* We consider only the evidentiary matter "specifically designated to the trial court." *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012). "[A]ll factual inferences" and "all doubts as to the existence of a material issue" are resolved in favor of the non-movant. *Id.* And we "give careful scrutiny" to make sure the non-movant's "day in

---

[1] *See* Ind. Code §§ 34-18-2-24.5, 34-18-3-1, 34-18-8-4 (1998).

court" is not improperly denied. *Siner*, 51 N.E.3d at 1187 (internal quotation marks and citation omitted).

The trial court's decision to admit or strike evidence is reviewed for an abuse of discretion. *Williams v. Tharp*, 914 N.E.2d 756, 769 (Ind. 2009).

# Discussion and Decision

We first address the award of summary judgment on Zaragoza's medical-malpractice claims, determining that Dr. Schultheis's affidavit was both admissible and sufficient to present triable issues of fact. We then address Zaragoza's deliberate-indifference claims, finding some evidence that each doctor knowingly failed to offer him a potentially safer alternative medication for treatment of his condition. As a result, we conclude that summary judgment was not warranted on these claims.

## I. Zaragoza's expert affidavit defeats summary judgment on the malpractice claims.

The elements of a medical-malpractice claim are "'(1) that the physician owed a duty to the plaintiff; (2) that the physician breached that duty; and (3) that the breach proximately caused the plaintiff's injuries.'" *Siner*, 51 N.E.3d at 1187 (quoting *Mayhue v. Sparkman*, 653 N.E.2d 1384, 1386 (Ind. 1995)). Generally, a plaintiff cannot prevail without presenting "expert opinion that a defendant health care provider's conduct fell below the applicable standard of care." *Chi Yun Ho v. Frye*, 880 N.E.2d 1192, 1201 (Ind. 2008). By the same token, however, "expert opinions which conflict on ultimate issues necessarily defeat summary judgment." *Siner*, 51 N.E.3d at 1190 (citing *Chi Yun Ho*, 880 N.E.2d at 1200–01).

In this appeal, Zaragoza does not claim that the defendants failed to carry their initial summary-judgment burden as to his malpractice claims. He argues only that the affidavit of Dr. Schultheis was sufficient to create an issue of fact. The defendants counter that Dr. Schultheis "failed to show that he was a qualified expert on the standard of care," drew conclusions about Zaragoza's condition "not based on the information contained

within the medical records," and opined without factual support that the defendants breached the standard of care and caused Zaragoza injury—all of which, they argue, renders his affidavit inadmissible. Appellees' Br. at 24–26.

We disagree with the defendants' argument that Dr. Schultheis's affidavit is not reliable enough to be admissible. And we agree with Zaragoza that the affidavit meets the sufficiency requirements set out in our case-law.

## A. The expert affidavit is admissible on summary judgment.

Affidavits presented on summary judgment must "set forth such facts as would be admissible in evidence." T.R. 56(E).[2] This includes compliance with the requirements for expert testimony in Indiana Rule of Evidence 702. Dr. Schultheis's affidavit satisfies this rule.

This Court has explained that the trial court is "the gatekeeper for expert opinion evidence" and must apply Rule 702(b) to "weed out unreliable 'junk science' from reliable scientific evidence." *Doe v. Shults-Lewis Child & Family Servs., Inc.*, 718 N.E.2d 738, 750 (Ind. 1999). For the court to perform this role, it "needs something more than a list of admissible facts and a bald conclusion drawn therefrom." *Id.* Thus, an affidavit supplying an expert opinion should "state the reasoning or methodologies upon which it is based." *Id.* At the summary-judgment stage, however, an expert need only provide the trial court "with enough information to proceed with a reasonable amount of confidence that the principles used to form the opinion are reliable." *Id.* at 750–51. This does not always require a complete exposition of the expert's methodology. *See*

---

[2] We note that the trial court denied the defendants' motion to exclude Dr. Schultheis's testimony from trial. That order is not before us. We may, however, consider affirming summary judgment on any legal theory supported by the evidence. *Owens Corning Fiberglass Corp. v. Cobb*, 754 N.E.2d 905, 914 (Ind. 2001); *Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind. 1998). This includes the inadmissibility of evidence.

*Thayer v. Vaughan*, 798 N.E.2d 249, 254 (Ind. Ct. App. 2003) (noting that an expert forensic psychiatrist was "uniquely trained" to analyze the plaintiff's state of mind and that he "detailed" how her statements supported his diagnostic conclusions); *Yang v. Stafford*, 515 N.E.2d 1157, 1161–62 (Ind. Ct. App. 1987) (deeming a medical expert's specialty licensure and "familiarity with the standard of care" sufficient to validate his methods on summary judgment); *cf. Akey v. Parkview Hosp.*, 941 N.E.2d 540, 543–46 (Ind. Ct. App. 2011) (delving more deeply into a cardiologist's methodology where his theory of causation had "not been scientifically tested, discussed in medical literature, or subjected to peer review"). Still, to comply with Rule 702(b) at summary judgment, we would expect a medical expert's affidavit at least to provide enough information to enable the trial court to infer what the standard of care is and in what way the defendant's care fell short.

The affidavit here describes, in considerable detail, Zaragoza's medical history, the treatment each doctor provided, and Dr. Schultheis's views on what they should have done differently to comply with the standard of care. His affidavit is no less detailed than those of the defendants. He notes, for example, that people with multiple allergies, like Zaragoza, "often react to acacia, an inactive ingredient" in medications such as Synthroid. App. Vol. II, p. 201. And he reasons that Zaragoza's reactions were so severe, persistent, and closely connected with taking Synthroid that they could not be a mere "sensitivity." *Id.* at 200–02. This inference, based on the medical records, supports Dr. Schultheis's conclusion that Zaragoza should have been offered an alternative, non-allergenic medication. Such an opinion, delivered by a qualified physician, is not the kind of "junk science" or "bald conclusion" that warrants weeding out at the summary-judgment stage.

The defendants also argue that Dr. Schultheis's opinion requires specialist expertise or experience with hypothyroidism or allergies. Indiana case-law has not demanded specialist medical qualifications from experts who possess demonstrable professional knowledge of the relevant medical matters. *See Bennett v. Richmond*, 960 N.E.2d 782, 789–90, 791 (Ind. 2012) (permitting a clinical psychologist to testify on the cause of a brain injury); *McIntosh v. Cummins*, 759 N.E.2d 1180, 1184–85 (Ind. Ct. App.

2001) (citing *Snyder v. Cobb*, 638 N.E.2d 442, 446 (Ind. Ct. App. 1994)) (permitting a family practitioner to testify on an orthopedic surgeon's standard of care). Even if we were to assume that Dr. Schultheis's conclusions did require specialist expertise, the same limitation applies to the defendants' affidavits, which claim no greater specialist knowledge or experience than Dr. Schultheis's affidavit does. This makes the defendants' argument self-defeating. Indeed, one of the grounds for Dr. Schultheis's criticism of the defendants is their failure to consult with a specialist.

For these reasons, we find Dr. Schultheis's expert affidavit admissible under Evidence Rule 702.

## B. The expert affidavit is sufficient to create triable issues of fact.

Aside from being admissible, an expert's affidavit must also be substantively sufficient. That is, it must supply enough information to show that a genuine issue of material fact exists.

In *Jordan v. Deery*, this Court explored whether a medical expert's affidavit was substantively sufficient to withstand summary judgment. 609 N.E.2d 1104, 1110–11 (Ind. 1993). That case arose from "personal injuries to mother and daughter" sustained "in the course of labor and delivery." *Id.* at 1106. An affidavit prepared by a physician expert, stating that "the defendants had breached the standard of care," was challenged on three grounds. *Id.*

The first challenge asserted that the expert's affidavit failed to show she was familiar with the standard of care at hospitals in communities like those involved in the case.[3] *Id.* at 1110. This Court found it sufficient that the affidavit, along with a curriculum vitae, indicated that the expert had attended medical school in Indiana, was licensed and practicing in-state,

---

[3] We no longer follow this "modified locality rule" for the standard of care. *Vergara v. Doan*, 593 N.E.2d 185, 186–87 (Ind. 1992).

and was familiar with the applicable standard of care. *Id.* Her "bare assertion" of familiarity sufficed. *Id.* Second, the defendants in *Jordan* asserted that the affidavit had to show the nature, reliability, and accuracy of the medical records reviewed. *Id.* This Court was satisfied by the expert's statement of having reviewed pertinent records that plainly came from the defendant hospital. *Id.* Lastly, the defendants faulted the affidavit's failure to describe the standard of care. *Id.* While acknowledging that the affidavit was "not informative in any way as to the nature of the deviation" from the standard of care, this Court concluded that the "lack of detail" went only to its "weight and credibility." *Id.* at 1111. The affidavit sufficed "under the facts of [the] case," we "reluctantly" concluded, because it established the affiant's "credentials as a medical expert," stated that pertinent medical records were reviewed, and set forth a "conclusion that the defendants violated the standard of care" and thereby "caused the complained-of injuries." *Id.* at 1201.

In *Chi Yun Ho*, this Court reiterated, albeit without citing *Jordan*, that a detailed discussion of the care provided is unnecessary. *Chi Yun Ho* considered the defendant surgeon's own affidavit and the deposition of another practitioner, which were "extremely sparse in factual content." 880 N.E.2d at 1200. Nevertheless, we held that "conflicting opinions regarding whether a physician met the applicable standard of care" were sufficient to defeat summary judgment, even "in the absence of facts supporting such opinions." *Id.* at 1201.

A plurality opinion of this Court in *Oelling v. Rao*, which predated *Jordan* and *Chi Yun Ho,* differed from our later decisions on this key point. *Oelling* required the affidavit presented by the plaintiff non-movants in that case to "set out the applicable standard of care." 593 N.E.2d 189, 190 (Ind. 1992) (plurality opinion). While Evidence Rule 702(b) requires enough information to infer what the standard of care is, affidavits as succinct as those in *Jordan* and *Chi Yun Ho* are substantively sufficient. That is because, at trial, a qualified expert's "medical opinion concerning breach of duty and causation," even if only "a conclusion," is "admissible in evidence." *Jordan*, 609 N.E.2d at 1111 (quoting *Kopec v. Mem'l Hosp. of South Bend*, 557 N.E.2d 1367, 1369 (Ind. Ct. App. 1990)). In a malpractice

case, such an opinion "takes on the character of an evidentiary fact." *Chi Yun Ho*, 880 N.E.2d at 1201. The opinion itself therefore meets the non-movant's burden on summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *See* T.R. 56(E). More generally, an expert may testify in the form of an opinion at trial without providing detailed factual explanations. *See* Ind. Evidence Rule 705 (permitting an expert on direct examination to "state an opinion and give the reasons for it without first testifying to the underlying facts or data"); *Dorsett v. R.L. Carter, Inc.*, 702 N.E.2d 1126, 1128 (Ind. Ct. App. 1998) (explaining that "the admissibility of expert testimony does not hinge on the expert's disclosure of the facts and reasoning that support his opinion"). We would not require greater substance on summary judgment than at trial. Nor do we wish to subject the affidavits of non-lawyers to unnecessary hurdles.

Here, Dr. Schultheis states that he attended medical school and obtained a degree, is currently licensed and practicing in Indiana (albeit not full-time since 1967), and is familiar with the standard of care both "for general practitioners in the State of Indiana" and "surrounding the facts and circumstances in this case." App. Vol. II, p. 199. He recites having "reviewed all of the relevant medical records" and having held "multiple conversations" with Zaragoza "regarding his medical treatment." *Id*. And he concludes that the doctors "did not follow the standard of care," thereby causing "injuries." *Id*. at 209. This suffices under *Jordan* to create a substantive "conflict of evidence" that "must be resolved by a trier of fact." *See Siner*, 51 N.E.3d at 1190.

Accordingly, the expert affidavit in this case is both admissible and sufficient for Zaragoza's medical-malpractice claims to survive summary judgment.

## II. Issues of fact exist on Zaragoza's deliberate-indifference claims.

The Eighth Amendment of the United States Constitution prohibits "cruel and unusual punishment" by "prison officials." *Roe v. Elyea*, 631

F.3d 843, 856–57 (7th Cir. 2011). This guarantee "safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* at 857 (internal quotation marks and citation omitted). It applies to "prison doctors" just as much as to "prison guards." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

On this issue, Zaragoza again argues, not that the defendants failed to carry their initial summary-judgment burden but, rather, that his own evidence presents triable issues of fact. He claims there is evidence to show the doctors refused to prescribe and provide him a safe alternative to Synthroid despite knowing the harm it was causing. The doctors contend that they did not display the necessary level of deliberate indifference to Zaragoza's medical needs. Rather, they argue, their care decisions reflected at least a minimal degree of medical judgment.

We first survey the applicable law. Then, taking each defendant doctor in turn, we again agree with Zaragoza that factual disputes remain.

## A. The deliberate-indifference standard.

A plaintiff seeking relief on a deliberate-indifference claim must prove two elements. First is the objective element of a "sufficiently serious" medical need—one that "has been diagnosed by a physician as mandating treatment" or one "so obvious that even a lay person would perceive the need for a doctor's attention." *Elyea*, 631 F.3d at 857 (internal quotation marks and citation omitted). A medical condition that "significantly affects an individual's daily activities" or "the existence of chronic and substantial pain" qualify as sufficiently severe. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (internal quotation marks and citation omitted).

Second, a plaintiff must prove the subjective element of a "sufficiently culpable state of mind"—meaning "the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Elyea*, 631 F.3d at 857 (internal quotation marks and citations omitted). This is a high bar. Medical professionals are "entitled to deference in treatment decisions unless no minimally competent professional" would have done the same. *Id.* (internal quotation marks and citation omitted). To violate the

constitution, the decision must mark "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (internal quotation marks and citation omitted). Inmates are "not entitled to the best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (citation omitted). And "administrative convenience and cost" may be appropriately weighed—but not "*to the exclusion of reasonable medical judgment* about inmate health." *Elyea*, 631 F.3d at 863 (citation omitted).

*Greeno v. Daley* is an instructive case finding triable Eight Amendment claims based on the alleged failure to provide effective treatment. *See* 414 F.3d 645 (7th Cir. 2005). In that case, the plaintiff claimed that prison officials did not adequately treat his vomiting and heartburn. *Id.* at 648. On summary judgment, the evidence favorable to the plaintiff showed that the drugs prescribed were ineffective in controlling his symptoms. *Id.* at 649. The plaintiff took painkillers after a fall, but these aggravated the condition of his esophagus. *Id.* Although a doctor promised an alternative painkiller, it was never given. *Id.* Nor did officials permit the plaintiff a bland diet. *Id.* He went without adequate treatment for over two years. *Id.* at 649–50. One nurse told him he had to live with his condition. *Id.* at 650. Finally, he was given ulcer medication and a bland diet, which worked. *Id.* But then he was moved and the prescription temporarily discontinued. *Id.* The Seventh Circuit Court of Appeals held that a factfinder could infer that certain defendants exhibited an "obdurate refusal to alter" the plaintiff's course of treatment "despite his repeated reports that the medication was not working." *Id.* at 654. Summary judgment as to several of the defendants was, therefore, improper. *Id.* at 658.

Somewhat similar is *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010). In that case, the plaintiff "developed a serious toothache" but the prison doctor and nurse provided only "over-the-counter pain relievers" and "refused to refer him to a dentist." *Id.* at 437. The plaintiff's evidence indicated that the doctor "persisted in this course of treatment even after" the painkillers proved "ineffective." *Id.* at 439. She "never contacted a dentist" for the apparent reason that the plaintiff was suffering "nothing more urgent than unexplained severe pain." *Id.* The Seventh Circuit

decided that a jury could conclude that the doctor "knowingly adhered to an easier method to treat Berry's pain that she knew was not effective" and found it "hard to imagine" she would have acted the same way if "seeing a civilian patient." *Id.* at 441.

By contrast, the appeals court in *Zingg v. Groblewski* affirmed summary judgment for a medical director who had denied a request for a potent immune-system drug to treat the plaintiff's severe psoriasis. 907 F.3d 630, 633 (1st Cir. 2018). Applying the federal summary-judgment standard,[4] the court found "no evidence" that the director knew a less potent topical medication "would not work," or that he had intended the plaintiff to take such medication on its own. *Id.* at 635–36. In any case, trying topical medications before immune-system drugs, the court concluded, aligned with the "treatment protocol." *Id.* at 636–37. Therefore, the director's actions could not be interpreted as "exhibiting a deliberate intent to harm or wanton disregard" for the plaintiff's health. *Id.* at 637 (internal quotation marks and citation omitted).

A closer case is *Pyles v. Fahim*, 771 F.3d 403 (7th Cir. 2014). In that case, the plaintiff suffered back pain after a fall. *Id.* at 405–06. He was initially hospitalized and given an MRI scan. *Id.* at 405. The plaintiff asserted that the prison doctor had "refused to record the true nature" of his complaints, send him for a second MRI, or refer him to a specialist. *Id.* at 407. Yet the doctor had adjusted his pain medication and medical staff had suggested stretches that "partly relieved" his pain. *Id.* The Seventh Circuit held that the decision to forego a second MRI was a question of medical judgment and that the plaintiff's back pain was "a common ailment" not presenting any "potentially serious long-term medical issue" requiring specialist care. *Id.* at 411–12. The doctor had prescribed new medications and changed the dosages in response to the plaintiff's pain, which was "not blatantly inappropriate" treatment. *Id.* at 412.

---

[4] Unlike in Indiana courts, "federal practice permits the moving party to merely show that the party carrying the burden of proof *lacks* evidence on a necessary element." *Hughley*, 15 N.E.3d at 1003 (citation omitted).

For our purposes, the critical point illustrated by the cases is as follows: Professional decisions based on medical judgment and the facts as the professional knows them do not constitute deliberate indifference. And a doctor does not have to comply with an inmate's requests for certain forms of care. But a "prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition." *Arnett*, 658 F.3d at 754 (citation omitted).

## B. There is some evidence of deliberate indifference by each doctor.

We now apply the law we have surveyed to the designated evidence in this case. We find disputes that preclude the award of summary judgment to any of the three doctors.

### 1. Dr. Byrd.

Dr. Byrd argues that the evidence shows he rendered at least minimally professional care in that he assessed Zaragoza, adjusted his Synthroid dosage, prescribed Neurontin for pain relief, and ordered lab tests after Zaragoza reported "dramatic side effects." App. Vol. II, p. 110. He states that Synthroid is an appropriate medication for hypothyroidism and that "there was no clinical reason" to believe Zaragoza was experiencing "any severe adverse reactions" to warrant a change of medication. Appellees' Br. at 19. Rather, he opines, it may have been Zaragoza's failure to take Synthroid as prescribed that caused him harm.

Zaragoza's designated evidence conflicts with Dr. Byrd's opinion. He presented his own affidavit stating that at "every visit" with all three defendant doctors he "always relayed" the "timing and severity level" of the "severe adverse effects" he had from Synthroid, including "severe headaches, neck pains, neck tightness, muscle pains, blurred vision, hip pains and cognitive problems." App. Vol. III, p. 14. Dr. Schultheis states in his affidavit that Dr. Byrd was "fully aware" of the "adverse effects and harm" Synthroid was causing Zaragoza, yet "disregarded" them. App. Vol. II, p. 202. There is also evidence that Dr. Byrd knew of alternative

drugs, even if none were listed in the DOC's formulary. He "wonder[ed] if Cytomel [was] more appropriate" in a lab-test request form. *Id.* at 223. And, according to Zaragoza, Dr. Byrd said he would have prescribed Armour Thyroid in a private-practice context because this alternative drug had helped somebody he knew with similar issues. Dr. Schultheis explained that Armour Thyroid is "often used successfully in patients who present with allergic reactions to Synthroid," although it requires "additional blood work to be done on a regular basis," whereas Synthroid is "cheaper and easier." *Id.* at 200. Lastly, Zaragoza stated that he took Synthroid as prescribed "every day" while he was on Neurontin but still suffered adverse effects. App. Vol. III, p. 182.

Drawing all inferences and resolving all doubts in favor of Zaragoza, a factfinder could infer that Dr. Byrd acted contrary to his professional judgment by failing to prescribe an alternative drug that he knew might treat Zaragoza's hypothyroidism without the severe effects of the cheaper and easier Synthroid. This would amount to deliberate indifference to serious medical need.

### 2. Dr. West-Denning.

Dr. West-Denning argues that she provided treatment in line with her medical judgment. She states that Zaragoza did not comply with his Synthroid prescription and that she warned him he would feel better if he took it properly. And she explains that she sought a "second opinion" about prescribing Armour Thyroid instead, but "medical leadership" deemed it "inappropriate" and "not aligned with standard medical practice." Appellees' Br. at 21.

However, other evidence suggests at least two possible grounds for deliberate indifference. Dr. Schultheis states, based on discussions with Zaragoza, that Dr. West-Denning advised him to take seven days' worth of Synthroid in one go so he "would only have to suffer the severe adverse effects" once a week. App. Vol. II, p. 206. In Dr. Schultheis's opinion, Dr. West-Denning did this "despite knowing the dangers," namely the serious adverse effects that even a "low dose" had previously led to. *Id.* Zaragoza recalls Dr. West-Denning describing his ensuing reaction as "extreme."

App. Vol. III, p. 17. This could be interpreted as blatantly inappropriate care and disregard of a substantial risk of harm.

Dr. Schultheis also infers from the records that Dr. West-Denning prescribed Tirosint, another potential alternative medication, although Zaragoza never received it. This would imply that Dr. West-Denning was aware of this potentially safer alternative to Synthroid. Yet she continued Zaragoza on Synthroid afterwards. Dr. West-Denning denies having ordered Tirosint, but it is not our place to determine the truth of this dispute. A factfinder could infer that Dr. West-Denning acted contrary to her professional judgment by knowingly and unnecessarily prescribing a harmful medication.

### 3. Dr. Rajoli.

Dr. Rajoli argues that Zaragoza has shown nothing more than "dissatisfaction or disagreement" with his course of care. Appellees' Br. at 23 (internal quotation marks and citation omitted). He asserts that he prescribed Tirosint but Zaragoza refused to take it. He explains that, later on, he prescribed Synthroid and recommended waiting for a clinical response, but Zaragoza refused that too. According to Dr. Rajoli, Zaragoza stopped complaining about his hypothyroidism and so he planned simply to monitor hormone levels.

Once more, Zaragoza's evidence contradicts the doctor's opinion. Zaragoza states that Dr. Rajoli discussed with him the use of Tironsint for people with allergies, but he was still only offered Synthroid. Dr. Schultheis agrees that Zaragoza was not given Tirosint and concludes that Dr. Rajoli refused to treat his hypothyroidism with an alternative medication. Indeed, Dr. Schultheis's opinion is that Dr. Rajoli "made little or no effort to treat" Zaragoza, "not even mentioning" his hypothyroidism "in most of the medical records" and giving little attention to "adverse effects" or "requests for alternate treatment." App. Vol. II, p. 207.

A factfinder could infer that Dr. Rajoli knew about Tirosint but failed to supply Zaragoza the alternative drug in place of Synthroid. If Dr. Schultheis is right, Dr. Rajoli left Zaragoza in an untreated condition.

Resolving doubts in Zaragoza's favor, we again find a triable issue as to deliberate indifference.

*    *    *

There is some evidence that each doctor offered Synthroid as the only option for Zaragoza to treat his hypothyroidism, despite knowing of its adverse effects and potentially safer alternatives. This is not, therefore, a case like *Zingg*, where the medical director was unaware that a generally accepted mode of treatment was ineffective for the plaintiff. Nor can we feel assured, like the *Pyles* court, that the care given was appropriate in the circumstances. Rather, as in *Greeno*, a factfinder could interpret the evidence as showing an "obdurate refusal" to move on from a plainly inadequate medication, leaving Zaragoza to choose between the intolerable side effects of the drug and untreated hypothyroidism—a diagnosed condition that all three doctors evidently thought warranted treatment on prescription. And we are concerned that, as in *Berry*, an inmate may have been denied a basic standard of care that a civilian could expect to receive. Given this possibility, we are persuaded that Zaragoza has met his burden to show a genuine issue for trial.

## Conclusion

Summary judgment is not a summary trial. Hence, we do not decide today whether the parties' claims or defenses are persuasive. We hold, simply, that genuine issues of material fact remain to be determined. Zaragoza's evidence raises questions that can only be answered by a factfinder after a trial. Accordingly, the summary judgment entered by the trial court is reversed.

Rush, C.J., and Massa, Slaughter, and Molter, JJ., concur.

ATTORNEY FOR APPELLANT

Brian A. Karle

Ball Eggleston, PC

Lafayette, Indiana

ATTORNEY FOR APPELLEES

Rachel D. Johnson

Stoll Keenon Ogden PLLC

Indianapolis, Indiana